## HAYDE v. BOYNTON.

Court of Appeals of District of Columbia.
Submitted March 15, 1928. Decided
May 7, 1928.

Petition for Rehearing Denied June 1, 1928.

No. 2056.

Patents ☞91(4)—Senior party held entitled to priority as to method for making concrete.

Senior party *held* entitled to priority as to invention relating to method for making concrete.

Appeal from the Commissioner of Patents.

Interference proceeding between Stephen J. Hayde and Carl W. Boynton. Decision for Boynton, and Hayde appeals. Reversed.

A. V. Cushman, of Washington, D. C., and W. H. Cloud, of Kansas City, Mo., for appellant.

A. E. Dowell, of Washington, D. C., and F. S. Lyon and Leonard S. Lyon, both of Los Angeles, Cal., for appellee.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

ROBB, Associate Justice. Appeal from a decision of an Assistant Commissioner of Patents awarding priority to the-party Boynton. The two counts of the interference read as follows:

"1. A concrete block or structure, consisting of cement, and an aggregate of vesicular material free from laminations or planes of cleavage resulting from subjecting suitable earthy material containing compounds capable of evolving gases to sufficient heat to incipiently fuse the material and generate gases therein which expand the material and render it vesicular; as and for the purpose set forth.

"2. As an article of manufacture, a crushed cellular cement aggregate comprising expanded argillaceous material free from laminations or planes of cleavage."

In the spring of 1913 Hayde, who theretofore had been in the building and contracting business, and who had made experiments with cinder concrete, turned his attention to the production of light aggregate, and subsequently engaged in the brick-making business. He testified that in 1913, through the use of a blow torch and two crucibles, he burned a small quantity of clay or shale into a light-weight, cellular product, a considerable portion of which would float. In August or September, 1914, the evidence discloses that he burned some light-weight aggregate material at the Ocean Shore Iron Works in San Francisco, and sent some of it to his nephew, George Hayde, at Kansas City, Mo., where he formerly lived, and to which place he returned late in 1915. The letter, dated October 7, 1914, accompanying this material, is in evidence as Exhibit 8, and the material sent is also in evidence as Exhibits 9, 10, and 11.

The Examiner of Interferences found that Exhibit 8 clearly discloses the use of light, burned clay material in concrete, and that the sample exhibits of the material are light; that some of them will float in water, and that they do not show laminations. Therefore he ruled that these exhibits and the testimony concerning them constituted a reduction to practice of count 2 and disclosure of count 1 as of October 7, 1914.

After his return to Kansas City, Hayde took charge of the brick plant of the Flannigan-Zeller Brick Company, and did nothing further with his invention until the fall of 1916, when he produced a quantity of burned shale and burned clay of the light expanded type. In the winter of 1917 he rigged up a rotary kiln on the plant site of the Flannigan-Zeller Brick Company in Kansas City and burned a considerable amount of material. On January 29, 1914, Hayde wrote a patent attorney concerning his invention, and considerable correspondence ensued, which is in evidence. This attorney died, and the correspondence was taken up with another attorney, who on July 3, 1917, filed an application for patent, and patent No. 1,255,878 issued to Hayde on February 12, 1918.

In the specification it is stated: "My invention relates to the manufacture of brick, tile, terra cotta, and like molded articles for

building, paving, and other purposes, from a raw material the basis of which is clay, shale, or similar argillaceous material. * * * It is to be understood that my invention includes such variations and modifications of the preferred procedure hereinafter referred to in detail and at length as will be obvious to those skilled in the art to which my invention relates. * * * The basic raw material will, during or after the mining operation in which it is removed from the original deposit, be broken up so as to pass through a screen having about a four-inch mesh, the large lumps being rejected, or broken into finer particles before being used, in order to facilitate the working of my process. * * * The breaking up or spontaneous disintegration of the material is prevented as much as possible during the cooling thereof, so that when the same is crushed the stronger and tougher portion will go through the crusher in as large lumps as the construction of the crusher will permit, while the weaker and more friable portion of the mass will be broken into finer pieces (dependent upon the toughness of various portions of the material), whereby particles ranging in size from the coarsest which may pass through the crusher to an impalpable dust will be produced at a single crushing operation." This patent carried no claims of the scope of those in issue.

During the pendency of his application for patent, Hayde formed an association with a Mr. Appo for the purpose of exploiting burned clay products, the name of the company being the Haydite Products Company. In February, 1918, Boynton entered the employ of the Concrete Ship Section of the United States Shipping Board Emergency Fleet Corporation in Washington, D. C. He was an engineer, and his immediate superior was Chief Engineer R. J. Wig.

Entertaining the view that his aggregate might be useful to the government in the construction of concrete ships, Hayde, through the Haydite Products Company, addressed a communication, dated February 18, 1918, to the Director of the Department of Concrete Ship Construction, United States Emergency Fleet Corporation, Washington, D. C., offering the use of his patented invention to the government, without charge, and inclosed "a small sample of Haydite concrete." After stating the results of the Kansas City testing laboratory, the communication continues: "As applied to concrete ship construction, the lighter weight of Haydite concrete, as compared with the ordinary sand and stone concrete, entirely overcomes Ad-

miral Taylor's objection in this respect. In reasonably rich mixes Haydite concrete will successfully meet all strength requirements. * * * Obviously, we shall be glad to place all of our data at your disposal, and, further, we shall be very glad to supply you with such quantities of Haydite *as will enable the Bureau of Standards to test it in every respect and to your entire satisfaction.* * * * "

On March 6th, following, the letter offering the use of Haydite was acknowledged by the Shipping Board, the letter being signed by R. J. Wig as Chief Engineer, and initialed by "CWB," who it is admitted was Carl W. Boynton, the appellee. In this letter, written by Mr. Boynton, it is stated: "We are quite interested in burnt clay as a concrete aggregate in connection with boat construction, and anticipate that this material can be developed to a point where it will give us the required strength, at the same time reducing the weight of concrete materially. The Bureau of Standards, at our suggestion has requested you to forward 500 pounds of your Haydite for tests." The 500 pounds of Haydite requested was sent the Bureau of Standards, and its receipt acknowledged. On July 3, 1918, over the signature of Mr. Boynton as Chief Inspecting Engineer, the report of the tests made at the Bureau of Standards of the material sent was furnished to the Haydite Company, with a further statement that, "as soon as the missing 28-day results are reported by the Bureau of Standards, they will be forwarded to you for your information." On October 4, 1918, the results of the 28-day tests were sent, with the request that the Haydite Company would "consider this information as confidential, and not for publication or other publicity." Under date of June 20, 1918, Richardson, an engineer in the Concrete Ship Section, wrote Appo that "the 28-day test of your shale Haydite gave over 4,000 pounds and was considered satisfactory. Your clay Haydite, which I found had not been tested, I had made up the last day I was there. All of this floated on water and I presume was a select lot."

Hayde also introduced in evidence, as his Exhibit 31, a certified copy of pages of the Engineering News-Record of the issue of July 11, 1918, containing an abstract of a paper delivered by "Messrs. Wig and Hollister at meeting of American Concrete Institute." In the article it is stated that concrete for concrete ships "must have a compressive strength of at least 4,000 pounds per square inch at 28 days, and a minimum weight"; that

"the commercial future of the concrete ships is in large measure dependent upon obtaining a light-weight concrete. Investigations are quite promising. *The strength and weight of one of these mixtures which meets our requirements* is as follows: One part cement to one part special fused clay below ¼-inch size to two parts same aggregate between ¼ and ½-in. size, had a compressive strength of 3,380 pounds per square inch at 7 days and 4,350 pounds per square inch at 28 days. It weighed 106 pounds per cubic foot in a saturated condition." These specifications are the same as those given in the report of the Bureau of Standards on the tests of the Haydite sent by the Haydite Company, and, as observed by the Examiner of Interferences: "The conclusion is irresistible that the figures used by Wig and Hollister in their paper before the American Concrete Institute prior to July 11, 1918, with regard to the satisfactory concrete made with 'fused clay,' were taken from government reports on concrete made with Haydite."

In May of 1918 Mr. Appo had an interview with Mr. Boynton at the office of the Shipping Board, the interview having been arranged through Mr. Davis of the Bureau of Standards. Mr. Wig was present for a time. The tests of Haydite that had been made by the Bureau of Standards were under discussion, and Appo explained to Boynton the process of burning Haydite, and a rough sketch was made of the burning kiln that Hayde then was using. Boynton expressed the opinion that the process was contrary to all known burning processes, and "was entirely outside of his knowledge of burning material and burning processes." Finally, Appo suggested that Boynton delegate some representative of the Shipping Board to go to Kansas City, where material would be burned in the presence of this representative, and that it would be found "on test that it approximated the material that we had originally sent to the Bureau of Standards." This suggestion was adopted by Boynton, and Richardson was sent to Kansas City. On May 26, 1918, Richardson made a detailed report to his superior, Boynton. In this report he said: "Some of the clay came through the cylinder a light cinder, and a good deal of it was not burned to a cinder and was heavy. Some of this was put back and went through a second time, with no appreciable improvement. Mr. Hayde thought it would have given better results if it had been disintegrated or broken up finer." In our view of the case, it is unnecessary further to consider the evidence for Hayde.

The interference originally involved applications of Willard D. Richardson and H. P. Brown (employees under Boynton in the Shipping Board), Croll, Boynton, and Larson. Subsequently Hayde was made a party. All of these parties, but Hayde and Boynton, have been eliminated. As originally declared, the interference involved but a single count, which contained no limitation that the aggregate should be "free from laminations or planes of cleavage."

The case came before the Law Examiner on a motion by Croll to substitute Croll's claim 1 for the issue, and a motion by Boynton to amend the issue. Both motions were denied by the Law Examiner, who, being of the view that the claim as drawn was anticipated by the patent to Senn, No. 930,801, required the insertion of the words "free from laminations or planes of cleavage," and suggested the addition of a second count, not limited to a concrete block. Both Boynton and Croll appealed to the Board of Examiners in Chief, who sustained the Law Examiner, and the issue was amended accordingly.

After an unsuccessful effort to have his patent reissue with claims to a process and an aggregate, Hayde filed the application in issue as "a continuation in part" of his patent, and was made a party to this interference. Thereupon Boynton moved to dissolve, on the ground that Hayde's application did not disclose the invention. In disposing of the motion, the Law Examiner said, in part: "It is evident that the raw material employed by Hayde may be laminated, since shale is a laminated material. The issue does not call for an unlaminated raw material, and count 2 is satisfied, so far as freedom from laminations is concerned, if the final product prior to crushing is unlaminated. It is immaterial that Hayde did not describe his burned product as free from laminations, if as a matter of fact it is in that condition. It would appear that raw material of a character which will produce the cellular structure described and claimed by Hayde will, when broken up and heated to the necessary extent to produce incipient fusion, result in an unlaminated material. There is no reason to confine the size of the broken pieces to a relatively large size, or such as will pass a 4-inch mesh, and Hayde's specification avoids restriction to any definite size."

The case then was considered by the Examiner of Interferences, who found that the earliest date that could be awarded Boynton for conception and reduction to practice was early in July, 1918, and that Hayde had

established conception and reduction to practice prior to that date.

The Board of Examiners in Chief found that there was no disclosure by Hayde of a material free from laminations or planes of cleavage, and awarded priority to Boynton, although he had introduced no evidence of conception or reduction to practice earlier than July, 1918.' The Assistant Commissioner affirmed the Board.

We are of the view that the decisions of the Board and the Assistant Commissioner are based upon a misconception of the evidence and the real meaning of the counts of the issue. It will be remembered that, before Hayde became a party to the interference, Boynton had objected to the insertion in the counts of the words "free from laminations or planes of cleavage." The Law Examiner found that Hayde's "burned material is crushed and conforms to the requirement of count 2, which calls for a crushed cellular cement aggregate comprising expanded argillaceous material free from laminations or planes of cleavage," and that "the aggregate disclosed by Hayde when used in the ordinary method of making concrete will produce the concrete block or structure of count 1, and Hayde obviously contemplates such use of his aggregate." In other words, it was the view of the Law Examiner that these counts, as finally drawn, meant that the crushed aggregate should be free from laminations or planes of cleavage.

We agree with this view. Crushed aggregate and cement are used to make the concrete block of the first count, and, if that aggregate is free from laminations or planes of cleavage, the block will possess the requisite strength, and such was the real object of the limitation. That Hayde had a conception of the use of his crushed aggregate and cement in ship construction conclusively appears from his communication to the Fleet Corporation, and whatever information he possessed concerning the subject was either directly or indirectly imparted to Boynton. The small sample which he inclosed with his original communication inspired a request by Boynton for the 500 pounds, which was sent for the express purpose of exhaustive tests. What was the purpose of these tests? Obviously to determine whether the material could be used in ship construction, and· the result of those tests demonstrated that it could. It is strange indeed that, if laminations or planes of cleavage appeared in the mixture, the Bureau of Standards did not discover it. No such question was raised by Boynton until long afterwards, for the obvi-

ous reason that there was nothing upon which to base it.

The Examiner of Interferences has carefully and impartially reviewed the evidence, and we are in accord with his reasoning and conclusion. We are fully convinced that Boynton derived his knowledge of the invention from Hayde, and that Hayde is entitled to the award of priority.

The decision is reversed.

Reversed.